# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

LISA D.,[1]

                           Plaintiff,

    vs.

ANDREW SAUL,
Commissioner of Social Security,

                           Defendant.     Case No. 3:19-CV-00242-TMB

## <u>DECISION AND ORDER</u>

On or about June 9, 2016, Lisa D. protectively filed applications for disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act"),[2] alleging disability beginning June 1, 2009.[3] Ms. D. has exhausted her administrative remedies and filed a Complaint seeking relief

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income. Lisa D. brought claims under Title II and Title XVI. Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI). For convenience, the Court cites the regulations governing disability determinations under both titles.

[3] Administrative Record ("A.R.") 11, 195–207. The applications list July 1, 2016 as the application date. A.R. 195, 202.

from this Court.[4] Ms. D.'s opening brief asks the Court to reverse and remand the agency decision.[5] The Commissioner filed an Answer and a brief in opposition to Ms. D.'s opening brief.[6] Ms. D. filed a reply brief on January 10, 2020.[7] Oral argument was not requested and was not necessary to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[8] For the reasons set forth below, Ms. D.'s request for relief will be granted.

## I. STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[9] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10] Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[11] In reviewing the agency's determination, the Court considers the

---

[4] Docket 1 (Lisa D.'s Compl.).

[5] Docket 12 (Lisa D.'s Br.).

[6] Docket 10 (Answer); Docket 13 (Defendant's Br.).

[7] Docket 14 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

Case No. 3:19-cv-00242-TMB, *Lisa D. v. Saul*
Decision and Order
Page 2 of 36

evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[12]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[13]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which he did not rely."[14]  An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[16]  In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect her own interests.[17]

---

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[17] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

Case 3:19-cv-00242-TMB   Document 16   Filed 04/29/20   Page 3 of 36

## II.    DETERMINING DISABILITY

The Social Security Act (the Act) provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[18]  In addition, Supplemental Security Income (SSI) may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[19]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[20]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[21]

---

[18] 42 U.S.C. § 423(a).

[19] 42 U.S.C. § 1381a.

[20] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[21] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Case No. 3:19-cv-00242-TMB, *Lisa D. v. Saul*
Decision and Order
Page 4 of 36

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[22] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[23] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[24] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[25] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."[26] *The ALJ concluded that Ms. D. had not engaged in substantial gainful activity since June 1, 2009, the alleged onset date.*[27]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the

---

[22] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[23] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[24] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[25] *Tackett*, 180 F.3d at 1101.

[26] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[27] A.R. 14.

twelve-month duration requirement.[28]  *The ALJ determined that Ms. D. had the following severe impairments: status post cervical cancer; chronic kidney disease; chronic ACL tear of the left knee; and degenerative disc disease of the lumbar spine.  The ALJ determined that Ms. D.'s mental impairments and vertigo were non-severe.*[29]

Step 3.  Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.[30]  If not, the evaluation goes on to the fourth step.  *The ALJ determined that Ms. D. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.*[31]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[32] *The ALJ concluded that Ms. D. had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that she was additionally limited to: standing and*

---

[28] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[29] A.R. 14–15.

[30] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[31] A.R. 16.

[32] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

*walking up to 4 hours in an 8 hour workday; sitting for up to 6 hours in an 8-hour workday; frequent climbing of ramps or stairs, kneeling, and crouching; occasional crawling; no climbing of ladders, ropes, or scaffolds; and avoiding concentrated exposure to non-weather related extreme cold, moving and hazardous machinery, and unprotected heights.*[33]

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.[34] Otherwise, the evaluation process moves to the fifth and final step. *The ALJ found that Ms. D. was not capable of performing past relevant work.*[35]

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[36] *The ALJ determined that there were other jobs existing in the national economy that Ms. D. was able to perform, including basket filler; garment sorter; and storage rental clerk.*[37]

---

[33] A.R. 16.

[34] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[35] A.R. 21.

[36] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[37] A.R. 21–22.

Case 3:19-cv-00242-TMB   Document 16   Filed 04/29/20   Page 7 of 36

The ALJ concluded that Ms. D. was not disabled from June 1, 2009, the alleged onset date, through August 29, 2018, the date of the ALJ's decision.[38]

## III.    PROCEDURAL AND FACTUAL BACKGROUND

Ms. D. was born in 1984; she is 35 years old.[39]  Ms. D. reported working as a housekeeper in a hotel; an office assistant; and personal care provider in the past.[40]  On November 22, 2016, the Social Security Administration ("SSA") determined that Ms. D. was not disabled under the applicable rules.[41]  On July 13, 2018, Ms. D. appeared and testified without representation at a hearing held before ALJ Paul Hebda.[42]  On August 29, 2018, the ALJ issued an unfavorable ruling.[43]  On July 24, 2019, the Appeals Council denied Ms. D.'s request for review.[44]  On September 6, 2019, Ms. D. appealed to this Court; she is represented by counsel in this appeal.[45]

---

[38] A.R. 22–23.

[39] A.R. 195, 202.

[40] A.R. 229.

[41] A.R. 80.

[42] A.R. 43–48.

[43] A.R. 8–23.

[44] A.R. 1–5.

[45] Docket 1.

Case No. 3:19-cv-00242-TMB, *Lisa D. v. Saul*
Decision and Order
Page 8 of 36

*Medical Records and Medical Opinion Evidence*

The following are the relevant medical records[46] after the alleged onset date of June 1, 2009:

From July 22 through July 24, 2012, Ms. D. saw Philip May, M.D., at University of Washington Medical Center. She was diagnosed with left ureteral obstruction and a urinary tract infection. At the time of initial evaluation, Dr. May determined that Ms. D.'s stent failed and she had signs of left renal obstruction indicated by left flank pain and rising creatinine. She had a left nephrostomy tube placed on July 23, 2012. She was discharged on July 24, 2012.[47]

On August 23, 2012, Ms. D. presented to the emergency department at Providence Seward Medical Center. She reported increasing left flank pain; feeling febrile; and nausea and vomiting. On physical examination, Ms. D. was awake, alert, and appeared to be in moderate distress. The attending physician assessed Ms. D. with left flank pain, UTI, and pyelonephritis. The renal ultrasound showed "significant improvement in hydronephrosis" with "no acute renal abnormalities."[48]

On December 31, 2012, Ms. D presented to the emergency department at Providence Seward Medical Center. On examination, the attending physician observed a nephrostomy site on her left flank with a foul smell and mild tenderness around the site.

---

[46] There are multiple duplicate treatment notes in the Court's record. To the extent possible, the Court cites the first treatment note to appear in the medical record.

[47] A.R. 284–86.

[48] A.R. 507–20.

The attending physician assessed Ms. D. with pyelonephritis. Ms. D. was provided Zofran and Vicodin for her symptoms.[49]

On January 30, 2013, Ms. D. had a CT scan of the abdomen and pelvis. The CT showed "[n]o renal or ureteral calculi"; "[i]nterval resolution of right-sided hydronephrosis"; "[i]nterval improvement of left-sided hydronephrosis"; and a "[p]ercutaneous nephrostomy tube with a ureteral stent extending into the bladder."[50]

On February 22, 2013, Ms. D. saw Jane Miller, M.D., at the University of Washington Medical Center. She underwent cystoscopic removal of her ureteral stent.[51]

From April 10 to April 16, 2013, Ms. D. underwent bilateral ileal ureters surgery and an appendectomy.[52]

On April 30, 2013, Ms. D. followed up with Dr. Miller. She reported generally "doing well" with normal bowel function and some incisional pain at the inferior region in the area of her skin radiation injury.[53]

On May 14, 2013, Ms. D. saw Dr. Miller. She reported episodes of fever, chills, and right-sided flank pain associated with nausea and vomiting the previous weekend, but Ms. D. reported that she did not seek medical care. She reported continued mild right-sided upper abdominal discomfort. Dr. Miller noted that Ms. D. was 4 weeks status

---

[49] A.R. 475–79, 522–26.

[50] A.R. 289–90.

[51] A.R. 282.

[52] A.R. 276–81.

[53] A.R. 274–75.

post bilateral ileal ureters for radiation induced ureteral strictures. Dr. Miller also noted that Ms. D. had undergone a cystogram with the removal of her Foley catheter two weeks previously. Dr. Miller assessed Ms. D. with elevated creatinine; hyperchloremic acidosis; urinary frequency; and incomplete emptying. Dr. Miller encouraged Ms. D. to reside in Seattle "until we see where [  ] her renal function nadirs out." She reported that Ms. D. insisted on returning to Alaska. Dr. Miller prescribed sodium bicarbonate every 6 hours to aid with morning acidosis.[54]

On May 21, 2014, Ms. D. saw with Robin Bassett, ANP, at ANMC. She reported "feeling well" that day. However, she also reported recurrent flank pain and blood in her stool. Ms. D. reported taking eight bicarb tablets in the morning and at night for acidosis, but ANP Bassett noted that she was prescribed 8 tabs total so Ms. D.'s account could not "be right." ANP Bassett noted that Ms. D. admitted having more muscle pain when she did not take bicarb and potassium citrate. She reported feeling nauseated from potassium citrate TID. On examination, Ms. D. was alert and oriented; in no acute distress; pleasant; cooperative; and with an appropriate mood and affect. ANP Bassett noted that Ms. D. denied dysuria, hematuria, flank pain, frequency, urgency, or incontinence, but had had nocturia consistently since surgery in April 2013. Her creatinine level was 1.3 mg/dL. ANP Bassett noted that Ms. D.'s renal ultrasound at the visit showed "no significant changes from previous and no apparent blockage." She noted that the bilateral hydronephrosis appeared "stable." ANP Bassett assessed Ms. D with chronic kidney

---

[54] A.R. 272–73.

Case 3:19-cv-00242-TMB   Document 16   Filed 04/29/20   Page 11 of 36

disease stage 3a "likely related to repeated infection and obstruction with chronic dehydration with Type 1 RTA and hypocalcemia and metabolic acidosis with hypocalciumia"; cancer of cervix with no recurrence after three years, but a new diagnosis of melena; and eczema.[55]

On June 27, 2014, Ms. D. followed up with Rebecca Johnson, M.D., at ANMC. She reported pain from "really bad kidney refluxes." Dr. Johnson observed that Ms. D. was alert and oriented; in no acute distress; and was cooperative. Dr. Johnson increased Ms. D.'s Percocet prescription for episodic, chronic pain.[56]

On November 20, 2014, Ms. D. followed up with ANP Bassett. She reported muscle weakness and soreness in her left leg. She reported kidney spasms in her left flank and reported continuing to take her potassium supplements and sodium bicarb. ANP Bassett reported that Ms. D. admitted "she notes more [muscle cramps] when she does not take bicarb and potassium citrate." ANP Bassett observed that Ms. D. was alert and oriented; in no acute distress; and "always smiling" with clear and coherent speech and an appropriate mood and affect. ANP Bassett noted that Ms. D.'s kidney function was "good and improved over previously and her potassium and magnesium levels [were] both good — her acid/base balance [was] good and [in fact] maybe even a bit overcompensated." Her creatinine was 1.2mg/dL. ANP Bassett also commented, "I do

---

[55] A.R. 441–60.

[56] A.R. 433–34.

Case 3:19-cv-00242-TMB   Document 16   Filed 04/29/20   Page 12 of 36

believe she is taking her med[ications] as prescribed." ANP Bassett recommended reducing the sodium bicarb prescription slightly.[57]

On December 9, 2014, Ms. D. saw Thomas Burke, M.D., at ANMC, for a follow-up examination five years after her initial diagnosis of cervix cancer squamous cell stage III. She reported feeling fine and having no complaints. Dr. Burke noted, "[t]his is the first time the patient said that." She reported that she was back to all normal activities with no significant flank pain and was eating and voiding normally. Dr. Burke noted that Ms. D.'s creatinine levels had been stable for over one year. He also noted that Ms. D.'s cervix cancer was "considered cured." Dr. Burke recommended following up in one year.[58]

On December 18, 2014, Ms. D. saw Dr. Lubke at ANMC. On physical examination, Dr. Lubke observed that Ms. D. was alert and oriented; in no acute distress; and with a soft, non-tender abdomen. Dr. Lubke noted that Ms. D.'s last creatinine was 1.2 on November 20, 2014 and was considered a stable finding. The renal ultrasound showed stable bilateral hydronephrosis, with the right "slightly more prominent than the left."[59]

On January 29, 2015, Ms. D. saw Scot Hines, M.D., at ANMC. She reported increasing difficulty with her left leg. Dr. Hines diagnosed Ms. D. with left knee pain; history of hydronephrosis and borderline renal function; psoriasis; and status post advanced cervical cancer. Dr. Hines noted that he could not "find any evidence of a

---

[57] A.R. 409–15.

[58] A.R. 400–02.

[59] A.R. 375–86.

neurological cause for her knee pain." He also noted a "mildly abnormal EMG/NCV of the [lower extremities]," but was "unable to find evidence of a concurrent radiculopathy or plexopathy."[60] The MRI of her lumbar spine showed bilateral hydronephrosis; a small synovial cyst arising from the left L4-L5 facet joint; and mild degenerative disc changes at L4-L5, with no spinal stenosis or neural foraminal.[61]

On March 31, 2015, Ms. D. saw Jeffrey Harmon, PA-C, at ANMC. She reported ongoing pain and clicking beneath her patella. She reported a hyperextension injury while playing basketball in middle school. On physical examination, Dr. Harmon observed a positive patella grind test and a positive Lachman 2mm. Ms. D. had an x-ray of her left knee. The x-ray showed diffuse demineralization and a slight medial compartment joint space narrowing.[62]

On July 31, 2015, Ms. D. saw William Lubke, M.D., at ANMC. Dr. Lubke diagnosed Ms. D. with acidosis; bilateral hydronephrosis; cancer of the cervix; chronic kidney disease, stage III; contact dermatitis and eczema; low blood potassium; renal tubular acidosis; ureteral obstruction on the left; and other urinary problems. The ultrasound taken at the visit showed stable bilateral hydronephrosis.[63]

On August 6, 2015, Ms. D. saw Zipporah Krishnasami, M.D., at ANMC. She reported that she had not been taking her bicarb medication regularly because it was "so

_____

[60] A.R. 352–54, 361.

[61] A.R. 358.

[62] A.R. 337–43.

[63] A.R. 304–11.

Case No. 3:19-cv-00242-TMB, *Lisa D. v. Saul*
Decision and Order
Page 14 of 36

powdery" and got "stuck."  She also reported that she could not straighten her back and she was hurting, especially her left knee/leg.  She requested a three-prong cane.  On physical examination, Dr. Krishnasami observed that Ms. D. was alert and oriented, but tearful at times.  Dr. Krishnasami also observed Ms. D. had a reducible ventral hernia with umbilical ulcer treated with topical cream; no active synovitis; walked with a limp, mildly hunched over; had intact bilateral lower extremity strength; coherent speech; and an appropriate mood and affect.  Her creatinine at the visit was 1.2 mg/dL.  Dr. Krishnasami assessed Ms. D. with stable stage 3 chronic kidney disease and hydronephrosis; hyperchloremic metabolic acidosis related to ileal-conduit and distal RTA; low bicarb with an admission Ms. D. had not been taking sodium bicarbonate; myalgias/muscle tightening related to metabolic acidosis and hypophosphatemia; an umbilical ulcer; and a history of ureteral reconstruction and cervical cancer.  Dr. Krishnasami recommended an increase in sodium bicarbonate; an increase in phosphate in diet; beginning kphos 500 mg and Robaxin 750 mg; wound care for non-healing umbilical ulcer; and a physical therapy referral for a cane.[64]

From December 1–3, 2015, Ms. D. was admitted to ANMC Hospital for severe hyperchloremic metabolic acidosis.  She received aggressive IVF repletion and electrolyte repletion.  She reported being compliant with her medications and supplements, but continued to have worsening of her electrolytes, cramping, and weakness.  The attending physician included medication non-compliance as a diagnosis.

---

[64] A.R. 758–63.

The renal ultrasound showed bilateral moderate hydronephrosis "which is slightly improved on the right and stable on the left." Her creatinine was 1.2 mg/dL. She was discharged on December 3, 2015. At the time of discharge, Ms. D. was able to complete her ADLs independently; she was alert; and her behavior/affect was appropriate.[65]

On January 6, 2016, Ms. D. saw Scott Walker, M.D., at ANMC. She reported having had falls due to leg muscle spasms associated with an electrolyte abnormality. Her creatinine was 1.3 mg/dL at the visit. Dr. Walker diagnosed Ms. D. with left flank pain and recommended continuing Percocet for pain management with expected improvement in four weeks and resolution in three to five months. He also assessed Ms. D. with a recent history of acute renal failure and URI.[66]

On February 4, 2016, Ms. D. saw Dr. Walker. She reported following up on a hospital admission for hyperchloremic metabolic acidosis. She reported continued large-muscle soreness in her legs and mild nausea. On physical examination, Dr. Walker observed that Ms. D. was alert and oriented; was "delightful"; and had normal range of motion and a normal gait. Her creatinine was 1.3 mg/dL. The x-ray of her chest showed no acute cardiopulmonary pathology.[67]

On April 11, 2016, Ms. D. followed up with ANP Bassett. She reported "feeling good which is relatively rare for Lisa." She reported taking magnesium prior to her

---

[65] A.R. 1018–32, 1073–74.

[66] A.R. 718–21.

[67] A.R. 996–1005.

potassium supplements. She "admit[ted] to not taking sodium bicarb but has been on potassium supplements and is taking [those]." On physical examination, ANP Bassett observed Ms. D. was alert and oriented; in no acute distress; "pleasant"; and ambulatory. Her creatinine was 1.1 mg/dL. ANP Bassett noted that Ms. D.'s kidney function was stable but her $CO_2$ was down. She noted that Ms. D. was not taking her sodium bicarb. ANP Bassett adjusted Ms. D.'s supplements and medications.[68]

On June 4, 2016, Ms. D. presented to the emergency department at Providence Seward Medical Center. She reported left flank pain radiating to the left lateral chest with nausea and vomiting. The attending physician noted that Ms. D. had been hospitalized in December 2015 for similar chest pain and that at that time her potassium was low. On physical examination, Ms. D. was alert and oriented with a normal gait and mild periumbilical erythema. Her creatinine was 1.14. The chest x-ray was normal. The renal ultrasound showed moderate bilateral hydronephrosis, new from prior. The attending physician refilled Ms. D.'s Zofran and prescribed an antibiotic for acute left pyelonephritis.[69]

On June 9, 2016, Ms. D. followed up with Robin Bassett, ANP. She reported intermittent cramping in her right thigh and groin. She reported she no longer took magnesium. She also reported that she continued to take potassium supplements and

---

[68] A.R. 977–93.

[69] A.R. 481–90, 504–05.

sodium bicarb.  ANP Bassett noted that Ms. D. was not taking enough bicarb and increased Ms. D.'s dosage.[70]

On September 7, 2016, Ms. D. presented to the emergency department at Providence Seward Medical Center.  She reported having chills, bilateral flank pain, headache, and some nausea and vomiting.  On physical examination, the attending physician observed that Ms. D. was an awake, alert, and oriented patient "who interact[ed] well with the examiner"; had normal speech and memory; and showed no evidence of vertigo.  The attending physician observed no cyanosis; no edema; and no weakness in the lower extremities.  Ms. D.'s creatinine level was 1.39 mg/dL.  The attending physician assessed Ms. D. with "symptoms similar to some of the episodes of pyelonephritis that she has had in the past."  Ms. D. was admitted for IV antibiotics and repletion of electrolytes.  Ms. D. was discharged on September 8, 2016.[71]

On October 13, 2016, Ms. D. saw Manpreet Bhandal, M.D., at ANMC.  She reported leg cramps on and off.  She also reported "sometimes miss[ing] her supplements," but otherwise she felt okay and had no complaints.  On physical examination, Ms. D. was alert and oriented; in no acute distress; and ambulatory.  Ms. D.'s creatinine was 1.1 mg/dL.  Dr. Bhandal recommended that Ms. D. have her

---

[70] A.R. 943–50.

[71] A.R. 857–75.

Case No. 3:19-cv-00242-TMB, *Lisa D. v. Saul*
Decision and Order
Page 18 of 36

magnesium and other electrolytes checked; follow up as scheduled with Dr. Burke; continue her medications; and stop smoking.[72]

On November 18, 2016, Ms. D. followed up with Dr. Lubke. Dr. Lubke noted that Ms. D.'s bilateral hydronephrosis and renal function were stable.[73]

On April 10, 2017, Ms. D. presented to the emergency department at ANMC Hospital. She reported falling out of a wheelchair when a shuttle bus "stopped abruptly." She reported pain in her right hand, thumb, upper forearm, and shoulder. Ms. D. reported that she was able to walk, but she lost her balance sometimes and was usually in a wheelchair. The x-ray of Ms. D.'s hand showed no dislocation or obvious fracture. Ms. D. was diagnosed with a hand contusion and discharged.[74]

On April 11, 2017, Ms. D. followed up with Dr. Bhandal. She reported being compliant with her supplements, but Dr. Bhandal noted that she "was not taking vitamin D, calcium and bicarbonate was being taken 2 tabs twice a day and not 4 twice a day." She also reported she "had a fall in the bus yesterday as the driver [braked] hard." She reported using a wheelchair "as her spasms are getting worse." On physical examination, Ms. D. was alert and oriented; in no acute distress; ambulatory; with clear and coherent speech; cooperative; and with an appropriate mood and affect. Dr. Bhandal adjusted Ms. D.'s medications.[75]

---

[72] A.R. 923–31.

[73] A.R. 1251–58.

[74] A.R. 1235–40.

[75] A.R. 1226–34.

On May 11, 2017, Ms. D. followed up with Dr. Bhandal. She reported that her "cramps [were] a lot better and she [felt] a lot better as her electrolytes are better." She reported "off and on" swelling of the lower extremities and that she was "still using a walker for protection." On physical examination, Ms. D. was alert and oriented; in no acute distress; ambulatory; with clear and coherent speech; cooperative; and with an appropriate mood and affect. Her creatinine was 1.3 mg/dL. Dr. Bhandal refilled and adjusted Ms. D.'s medications. He prescribed 4 tabs BID of sodium bicarb.[76]

On June 30, 2017, Ms. D. saw Dr. Burke. Dr. Burke noted that Ms. D. had "what appears to be stable bilateral hydronephrosis" and that the renal ultrasound performed at the visit was "again stable." She reported being seen once for a UTI in November 2016, "but is otherwise doing well."[77]

On August 10, 2017, Ms. D. saw Darpan Gandhi, M.D., at ANMC. She reported that she felt better, had no complaints, and was taking all of her medications regularly. On physical examination, Dr. Gandhi observed that Ms. D. was alert and oriented; ambulatory with a normal gait; and was cooperative with an appropriate mood and affect. A recent PET scan "to rule out recurrence of her cervix cancer" was normal. The bone density DEXA showed osteoporosis. The reviewing physician recommended a repeat bone density assessment in two years. It was also recommended that Ms. D. begin

---

[76] A.R. 1212–19.

[77] A.R. 1197–1205.

Case No. 3:19-cv-00242-TMB, *Lisa D. v. Saul*
Decision and Order
Page 20 of 36

estrogen replacement therapy, but that she had been "counseled as to this option many times in the past but has never followed through with the medication."[78]

On November 17, 2017, Ms. D. presented to the emergency department at ANMC for bicarbonate infusion due to "abnormal labs." She reported a recent episode of severe heartburn resulting in nausea and vomiting. She reported having difficulty taking her medications, "especially sodium bicarb." On physical examination, the attending physician observed abdominal tenderness; "dry grayish patches on lower extremities"; and normal orientation and coordination. The attending physician noted a possible UTI, but also noted that Ms. D. reported building up resistance to antibiotic due to multiple UTIs.[79]

On November 22, 2017, Ms. D. followed up with Robert Reeg, M.D., at ANMC by telephone. He prescribed Cipro. He noted that Ms. D.'s creatinine was 1.4 mg/dL.[80]

On January 30, 2018, Ms. D. followed up with Michael Nasenbeny, M.D., and Dr. Bhandal, at ANMC. She reported "significant muscle spasms" and an abdominal hernia. Her creatinine was 1.3 mg/dL. On physical examination, Dr. Nasenbeny observed a "large soft hernia just left and superior to her umbilicus." Dr. Nasenbeny referred Ms. D. to surgery and refilled her narcotic pain medication.[81]

_____

[78] A.R. 1173–81, 1188–91.

[79] A.R. 1135–40.

[80] A.R. 1140–41.

[81] A.R. 1150–63.

Case No. 3:19-cv-00242-TMB, *Lisa D. v. Saul*
Decision and Order
Page 21 of 36

On June 25, 2018, Ms. D. followed up with Dr. Bhandal. She reported being compliant with her medications, except Vitamin D. Dr. Bhandal recommended following up in 6 months.[82]

On May 17, 2018, Ms. D. saw Katie Ernst, APRN, at North Star Health Clinic for follow up and to refill her medication for anxiety. She stated that she was "here today with her mother to discuss her conditions as she is applying for disability." Ms. D. reported needing to "start pain medication for her pelvic pain and flank pain" and that she "cannot stand for long periods of time due to her feet and leg swelling." She also reported vertigo type symptoms for the past six months. APRN Ernst reported that Ms. D. denied urinary symptoms. On physical examination, APRN Ernst observed that Ms. D. was alert and oriented; tearful; had bilateral lower extremity swelling; an open umbilicus skin with drainage; and a slow gait. She observed that Ms. D.'s ears and nose were "consistent with allergic type symptoms with seasonal change." Ms. D. stated "she [was] unable to work due to not only her significant medical history and current comorbidities, but also due to her frequent scheduled medical appointments and lab draws which are at least monthly." APRN Ernst opined, "[Ms. D.]'s diagnosis of cervical cancer has had an enormous impact on her ability to complete her activities of daily living. She suffers with chronic pain, nausea, and fatigue secondary to her chemo and radiation therapy on initial diagnosis. Her kidney and bowel function [are] abnormal and [she] requires frequent visits to specialists. Her leg swelling and pain prevents her from standing and walking for

---

[82] A.R. 1289–97.

Case No. 3:19-cv-00242-TMB, *Lisa D. v. Saul*
Decision and Order
Page 22 of 36

long periods of time. She suffers from malaise and nausea which prevent her from being a reliable employee due to her illness. Her anxiety related to her comorbidities causes overwhelming emotion when in public situations due to her diagnosis and physical/emotional trauma. She is unable to work due to the need for pain management medication secondary to her muscle spasms and lower back/flank pain [after] surgery. At this time, [Ms. D.] is working towards getting herself healthy and controlling her symptoms [after] radiation/chemo."[83]

On October 4, 2018, Dr. Nasenbeny wrote a letter on Ms. D.'s behalf. He stated, "[i]t is my medical opinion that due to [Ms. D.]'s multiple chronic medical conditions she is not physically capable of working and is medically disabled."[84]

*Function Reports*

On August 30, 2016, Ms. D. completed a function report. She reported that she had "chronic low potassium that effects my muscles in my legs" and muscle spasms lasting about 30 seconds. She reported that she woke up at night with fevers and small muscle spasms; had kidney pain from multiple surgeries and chronic kidney disease; and was nauseated a lot, affecting her daily routine. She reported that her daily routine was to take medications; eat a snack; watch television or use the computer "for a couple hours," and take naps in the afternoon. She reported having pets and buying them food, feeding them, and providing water. She reported needing help getting on her pants,

---

[83] A.R. 1309–12.

[84] A.R. 28.

underwear, and socks, but could perform her other personal care. She indicated she could prepare simple meals such as frozen meals and sandwiches, but that a friend would come over to "cook a good meal for me" and help with the housework and doing the dishes. Ms. D. also reported that she could do one load of laundry per week; did not do yardwork; sat outside each day; shopped by computer; could handle her finances; and could follow written instructions very well. She indicated that she could drive, but when she traveled, she rode in a car. Ms. D. reported that she did not handle stress well due to "bad anxiety." She reported using a cane to get up sometimes and that she used a wheelchair when she needed to go long distances. She remarked that she had been hospitalized "a lot in this past year due to chronic low potassium problems" and often presented to the emergency room for nausea, throwing up, chills, and fevers.[85]

*Testimony on July 13, 2018*

On July 13, 2018, Ms. D. appeared and testified before ALJ Paul Hebda without representation. Ms. D. testified that she had not worked since June 2009. She testified that she lived in an apartment with a roommate. She reported that she did not drive and that she had "problems taking my sodium bicarb, which is for my kidney disease." Ms. D. acknowledged that her doctor said she wasn't compliant, but she testified that she "was taking it, but, it was [   ] making me throw up, so they changed [   ] the dosage, and everything. So things have been better with that." She testified that she had muscle spasms that would cause difficulty with dressing; that she had a shower chair; and her

---

[85] A.R. 262–270.

Case 3:19-cv-00242-TMB   Document 16   Filed 04/29/20   Page 24 of 36

mother and roommate helped her with shopping and taking care of the apartment. Ms. D. reported spending her days watching TV or going on a drive as a passenger. She testified she had cats.[86]

Stephen Andersen, M.D., testified as the medical expert. Based on a review of the medical record, Dr. Andersen testified that Ms. D. had cervical cancer treated with surgery and radiation "and that seems to be pretty much cured now." He noted scarring of the uterus and kidney disease from radiation that necessitated ileal bypass surgery in 2013 and left her with chronic kidney disease. Dr. Andersen noted that the kidney disease had been closely followed by Ms. D.'s nephrologist and "which when she has been compliant with her medication, seems to do fairly well." Dr. Andersen also testified, "[a]nd it looks like she did take her medications, but, [she] would sometimes end up in the hospital because of electrolyte abnormalities due to the chronic kidney disease." Dr. Andersen noted that Ms. D.'s vertigo had only been a complaint "in the past few months." He testified that Ms. D.'s physicians recommended "just conservative management" of her chronic tear of the ACL and chronic slightly degenerative condition in the knee cap. Dr. Andersen opined that Ms. D.'s hypokalemia had been controlled "when she takes her medication." He opined that Ms. D.'s impairments did not meet or equal a listing. He provided an RFC with the following limitations: occasionally lifting and carrying twenty pounds; frequently lifting and carrying ten pounds; standing or walking four hours and sitting six hours out of an eight-hour workday; no pushing or pulling except as listed with

---

[86] A.R. 34–35, 43–48.

Case No. 3:19-cv-00242-TMB, *Lisa D. v. Saul*
Decision and Order
Page 25 of 36

the weight restrictions; frequently climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently crouching; occasionally crawling; avoiding concentrated cold, humidity, vibration, fumes, and concentrated hazards.[87]

Collette Valette, a clinical psychologist, testified as a medical expert. Based on her review of the record, Dr. Valette testified that Ms. D. had a diagnosis for anxiety but did not take medication for it. She opined that Ms. D. had no mental health limitations.[88]

William Weiss testified as the vocational expert. Based on the ALJ's first hypothetical,[89] VE Weiss opined that Ms. D. would not be able to perform her past relevant work in home healthcare. He opined that Ms. D. would be able to perform other jobs at the light level in the national economy, including personal attendant (DOT 309.674-014); basket filler (DOT 529.687-010); garment sorter (DOT 222.687-014); and storage rental clerk (DOT 295.367-026).[90]

---

[87] A.R. 36–40.

[88] A.R. 41–43.

[89] The ALJ's first hypothetical was as follows:

> I have an individual of the claimant's age, education, past work, who would be able to perform light level work as defined by the Social Security Administration, but with the following modifications. Standing and walking would be up to four hours in an eight-hour day, and then sitting would be up to six hours in an eight-hour day. You would have frequent climbing of ramps and stairs, kneeling, and crouching. Only occasional crawling, and we would have no climbing of ladders, ropes, or scaffolds. We would also have the avoidance of concentrated exposure to non-weather-related extreme cold, moving and hazardous machinery, and unprotected heights. A.R. 49–50.

[90] A.R. 48–52.

Case 3:19-cv-00242-TMB   Document 16   Filed 04/29/20   Page 26 of 36

# IV.    DISCUSSION

Ms. D. is represented by counsel.  In her opening brief, Ms. D. alleges that the ALJ's decision is not supported by substantial evidence and is the product of reversible errors of law because the ALJ: (1) failed to fully and fairly develop the record "with respect to the appropriate residual functional capacity from the alleged onset date through the entire period at issue"; (2) failed to account for Ms. D.'s cane in the RFC; and 3) provided a defective RFC to the vocational witness.[91]  She seeks remand for de novo hearing and a new decision.[92]   The Commissioner disputes Ms. D.'s assertions.[93]   The Court addresses each of Ms. D.'s assertions in turn:

## A.  Development of the Record

Ms. D. asserts that the ALJ failed to fully and fairly develop the record.  She alleges that the ALJ should have "simply asked Dr. Andersen to account for the period separately from the alleged onset date through the period when Dr. Andersen opined that her present condition permits Light exertional capacity RFC."[94]  Ms. D also alleges that 1) the ALJ decision "mischaracterized Dr. Andersen's testimony and opinion" regarding the issue of medication compliance and 2) Dr. Andersen's testimony failed to take account of Ms. D.'s use of a cane, walker, and wheelchair.[95]

---

[91] Docket 12 at 17–24.

[92] Docket 12 at 24.

[93] Docket 13 at 2–7.

[94] Docket 12 at 17.

[95] Docket 12 at 18.

1. *Legal Standard*

The ALJ has an "independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[96]  An "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."[97]

2. *Disability Determination Time Period*

In this case, Dr. Andersen reviewed Ms. D.'s medically determinable impairments in the record before him, determined that none of the impairments met or equaled a listing, and provided an opinion as to the limitations Ms. D. required in the RFC.[98]  Other than a comment that Ms. D.'s cervical cancer "seems to be pretty much cured now according to her follow-up visits with . . . gynecology oncology," Dr. Andersen's testimony did not distinguish between Ms. D.'s condition at present and her condition during the disability determination period as a whole.[99]  Dr. Andersen's testimony regarding the disability determination period was not ambiguous and the record was not inadequate on this issue. The ALJ did not have a duty to ask Dr. Andersen to bifurcate the disability period or otherwise develop the record further on this point.

---

[96] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001) (internal citations and quotations omitted).

[97] *McLeod v. Astrue,* 640 F.3d 881, 885 (9th Cir. 2011) (internal citations omitted).

[98] A.R. 36–39.

[99] A.R. 36.

Case No. 3:19-cv-00242-TMB, *Lisa D. v. Saul*
Decision and Order
Page 28 of 36

### 3. Medication Compliance and Use of a Cane

In his decision, the ALJ focused on the issue of Ms. D.'s medication compliance.[100]

"An ALJ properly considers evidence associated with treatment, including evidence of improvement."[101] Here, the ALJ assigned "great weight" to the opinion of Dr. Andersen, including Dr. Andersen's testimony regarding Ms. D.'s compliance with her medications.[102] At the hearing, Dr. Andersen gave the following relevant testimony:

> As a side effect of the radiation, they think that caused some scarring in her uterus, which was also in kidney disease, and that necessitated what's called an ileal bypass. And that was done in 2013, and that has left her with some chronic kidney disease, which has been followed closely with her Nephrologist, *which when she has been compliant with her medication, seems to do fairly well.*
>
> And, *it looks like she did take her medications, but, [she] would sometimes end up in the hospital because of electrolyte abnormalities due to the chronic kidney disease.*[103]

However, the ALJ's summary of Dr. Andersen's testimony regarding Ms. D.'s medication compliance was inaccurate. The ALJ stated in his decision:

> Dr. Andersen testified [Ms. D.] has been followed closely by a nephrologist. He further testified that when [Ms. D.] is compliant with her medications, she seems to do fairly well. Dr. Andersen noted [Ms. D.], at times, *would not*

---

[100] A.R. 17–21.

[101] *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (effective for claims before March 27, 2017) (treatments or other methods used to alleviate symptoms are "important indicator[s] of the intensity and persistence of your symptoms"); *Tommasetti v. Astrue,* 533 F.3d 1035, 1039–40 (9th Cir. 2008) (ALJ may consider evidence of favorable response to conservative treatment); *Warre v. Comm'r of the SSA,* 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

[102] A.R. 17–18.

[103] A.R. 36–37 (emphasis added).

*take her medications*, which resulted in hospitalizations due to electrolyte abnormalities.[104]

The ALJ's error is not harmless.[105]  "[A]lthough we will not fault the [ALJ] merely for explaining [his] decision with less than ideal clarity, we still demand that the [ALJ] set forth the reasoning behind [his] decisions in a way that allows for meaningful review."[106] Here, the ALJ assigned great weight to the testimony and opinion of Dr. Andersen.  At the same time, the ALJ inaccurately summarized Dr. Andersen's hearing testimony regarding Ms. D.'s hospitalizations and medication compliance.  Further, the medical record is not entirely clear.  Ms. D. was hospitalized multiple times during the disability determination period for repletion of electrolytes and for bicarbonate infusions.[107]  Some treatment records noted that Ms. D. experienced more muscle cramps when she did not take her medications or that she was taking an incorrect dosage, but in other records Ms. D.'s providers made adjustments to the dosages even when Ms. D. reported taking her medications as prescribed.[108]

Dr. Anderson's testimony and the record evidence regarding Ms. D.'s medication

---

[104] A.R. 17 (emphasis added).

[105] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) ("Even when the ALJ commits legal error, we uphold the decision where that error is harmless, meaning that it is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity.") (internal quotation marks and citations omitted).

[106] *Id.*

[107] *e.g.,* A.R. 1018–32, 857–67, 1135–40.

[108] *e.g.,* A.R. 409–14, 454, 943, 977, 1226.

Case No. 3:19-cv-00242-TMB*, Lisa D. v. Saul*
Decision and Order
Page 30 of 36

compliance is ambiguous. Ms. D.'s medication compliance also appears to be the only specific reason the ALJ rejected Ms. D.'s testimony. Therefore, the ALJ failed to fully and fairly develop the record regarding Ms. D.'s medication compliance. The Court does not address Ms. D.'s argument that Dr. Andersen should have testified about Ms. D.'s use of a cane, walker, and wheelchair as the ALJ will also have the opportunity to address this issue on remand.

B. <u>Ms. D.'s Symptom Testimony</u>

Ms. D. asserts that the "record reflects no attempt at the hearing to inquire why she allegedly failed to comply with the medication regimen." Ms. D. contends that she "testified at [the] hearing that she was compliant, and specifically disputed medical records that noted non-compliance."[109]

Credibility determinations are the province of the ALJ.[110] An ALJ engages in a two-step analysis to determine the credibility of a claimant's testimony regarding subjective pain or symptoms.[111] In the first step, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."[112] On this point, the ALJ determined that Ms. D.'s status post cervical cancer;

---

[109] Docket 12 at 19–22.

[110] *Fair v. Bowen,* 885 F.2d 597, 604 (9th Cir. 1989).

[111] *Garrison v. Colvin,* 759 F.3d 995, 1011 (9th Cir. 2014); *Treichler v. Comm'r of Soc. Sec. Admin.,* 775 F.3d 1090, 1102 (9th Cir. 2014).

[112] *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) (*superseded by statute,* 20 C.F.R. §§ 404.1529 (c)(3), 416.929 (c)(3), *effective for claims before March 27, 2017*).

chronic kidney disease; chronic ACL tear of the left knee; and degenerative disc disease of the lumbar spine were severe impairments.[113]

In the second step, the ALJ evaluates the intensity and persistence of a claimant's symptoms by considering "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings and statements about how [the claimant's] symptoms affect [her]."[114] If a claimant meets the first test and there is no evidence of malingering, the ALJ may reject testimony regarding the claimant's subjective pain or the intensity of symptoms, but must provide "specific, clear and convincing reasons for doing so."[115] The ALJ is required to "specifically identify the testimony from a claimant she or he finds not to be credible and explain what evidence undermines [that] testimony"; general findings are insufficient.[116] An ALJ may consider at least the following factors when weighing the claimant's credibility: claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between her testimony and her conduct, claimant's daily activities, her work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains.[117] If the ALJ's credibility finding is supported by

---

[113] A.R. 14.

[114] 20 C.F.R. §§ 404.1529(a), 416.929(a) (text of subsection for claims before March 27, 2017).

[115] *Smolen,* 80 F.3d at 1281; *Ghanim v. Colvin,* 763 F.3d 1154, 1163 (9th Cir. 2014).

[116] *Treichler,* 775 F.3d at 1102 (quoting *Holohan v. Massanari,* 246 F.3d 1195, 1208 (9th Cir. 2001); *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995)).

[117] *Thomas v. Barnhart,* 278 F.3d 947, 958–59 (9th Cir. 2002) (internal quotations and citations omitted).

substantial evidence in the record, we may not engage in second-guessing.[118]

In his decision, the ALJ concluded that Ms. D.'s "complaints of kidney dysfunction [were] not as disabling as she alleg[ed]." He provided the following reason: "As Dr. Andersen testified to, the majority of [Ms. D.]'s exacerbations came when she was non-compliant with her medications." And, "[a]t the hearing [Ms. D.] testified that she would often not take her medication, as the medication would make her nauseous, which she also noted on August 30, 2016."[119]

Ms. D. actually testified that she did "have problems taking my sodium bicarb, which is for my kidney disease" and that was "what the doctor [was] talking about that they were saying that I wasn't compliant, but, I was. I was taking it, but, it was [  ] making me throw up, so they changed [    ] the dosage, and everything. So things have been better with that."[120]

Again, the ALJ's above account of Ms. D.'s testimony regarding her medication compliance was not entirely accurate. Further, the ALJ did not provide any other specific reasons for discounting Ms. D.'s testimony.[121] For example, the ALJ did not discuss Ms. D.'s very limited daily activities in the record. Ms. D. testified that she had muscle spasms that would cause difficulty with dressing at times; she used a shower chair to shower; and her mother and roommate helped her with shopping and taking care of the apartment.

---

[118] *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

[119] A.R. 20–21.

[120] A.R. 44.

[121] *See Brown-Hunter,* 806 F.3d at 494.

Ms. D. reported spending her days watching TV or going on a drive as a passenger.[122] In her August 2016 report, Ms. D. reported similar limited daily activities.[123] Treatment records also specifically noted the few times that Ms. D. indicated she actually felt fine.[124]

For the foregoing reasons, the ALJ failed to provide specific, clear and convincing reasons for discounting Ms. D.'s symptom testimony.

### C. The RFC and VE Testimony

Ms. D. alleges that the RFC does not reflect all of her limitations, specifically, it "takes no account of cane/walker, wheelchair" and it fails "to account for electrolyte abnormalities that are a result of chronic kidney disease."[125]

A court should affirm an ALJ's determination of a claimant's RFC "if the ALJ applied the proper legal standard and his decision is supported by substantial evidence."[126] In assessing an RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"[127] It is "proper for an ALJ

---

[122] A.R. 44–46.

[123] A.R. 263.

[124] *e. g.,* A.R. 400 (In December 2014, Ms. D. reported at her appointment with Dr. Burke that she was "feeling fine" with no complaints. "This is the first time the patient said that."); A.R. 977 (In April 2016, she reported "feeling good which is relatively rare for Lisa.").

[125] Docket 12 at 23.

[126] *Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005) (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)).

[127] *See* SSR 96-08p, *available at* 1996 WL 374184 at *5; 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'").

to limit a hypothetical to those impairments that are supported by substantial evidence in the record."[128]  But, "an RFC that fails to take into account a claimant's limitations is defective."[129]  When posing a hypothetical question to a VE, the ALJ's "depiction of the claimant's disability must be accurate, detailed, and supported by the medical record."[130]  And, "[h]ypothetical questions asked of the vocational expert must 'set out all of the claimant's impairments.'"[131]

In this case, the ALJ's RFC mirrored Dr. Andersen's testimony.  However, the ALJ's RFC determination is flawed because, as explained above, the ALJ improperly discounted Ms. D.'s testimony and relied on an inaccurate presentation of Dr. Andersen's testimony in the decision.  Accordingly, the ALJ's RFC may not have reflected all of Ms. D.'s limitations and is defective.

### D.  Scope of Remand

The "ordinary remand rule" applies to disability cases.  Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[132]  Here, the ALJ failed to fully and

---

[128] *Osenbrock v. Apfel,* 240 F.3d 1157, 1165 (9th Cir. 2001) (citing *Magallanes v. Bowen,* 881 F.2d 747, 756-57 (9th Cir. 1989) ("the ALJ was free to accept . . . that the claimant's depression was mild and would not significantly interfere with the performance of work related activities.")).

[129] *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).

[130] *Tackett v. Apfel,* 180 F.3d 1094, 1101 (9th Cir.1999).

[131] *Lewis v. Apfel,* 236 F.3d 503, 517 (9th Cir.  2001) (internal citation omitted).

[132] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

fairly develop the record regarding Ms. D.'s medication compliance and did not provide specific, clear and convincing reasons for rejecting Ms. D.'s symptom testimony. Further, Ms. D.'s requested remedy is to remand for further proceedings. Therefore, the case will be remanded for a new hearing and decision consistent with this decision. The ALJ will specifically elicit testimony regarding Ms. D.'s medication compliance and use of assistive devices, will follow up with Ms. D.'s treating physicians on those issues if necessary, adjust the RFC accordingly, and issue a new decision.

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error and are not supported by substantial evidence in the record. Accordingly, IT IS ORDERED that Ms. D.'s request for relief at Docket 12 is **GRANTED** as set forth herein, the Commissioner's decision is **VACATED**, and the case is **REMANDED** to the SSA for further proceedings consistent with this decision.

The Clerk of Court is directed to enter a final judgment accordingly.[133]

DATED this 29th day of April, 2020 at Anchorage, Alaska.


*/s/ Timothy M. Burgess*
UNITED STATES DISTRICT JUDGE

---

[133] Due to the coronavirus pandemic, by Miscellaneous General Order 20-11, the District of Alaska imposed a stay on all civil matters for 30 days, effective March 30, 2020. Effective May 1, 2020, Miscellaneous General Order 20-13 extends Miscellaneous General Order 20-11 until June 1, 2020. As the presiding judge in this matter, the undersigned vacates the stay in this case to allow entry of judgment and post-judgment motions. *See* MGO-20-11 at 6–7; MGO-20-13 at 5-6. However, the parties may move or stipulate to extend any filing deadlines.